Voto particular disidente emitido por la
Jueza Asociada Se-ñora Pabón Charneco,
al que se unieron los Jueces Aso-ciados Señores Kolthoff Caraballo, Rivera García y es-trella martínez.
Nuestros retos económicos no pue-den ser solventados aplastando la dignidad de nuestros servidores públicos. Ante los nuevos retos, son necesarios nuevos pactos y consensos sociales. A éstos no podremos llegar cultivando la desconfianza de los ciudadanos en las instituciones. (Énfasis suplido y en el original). Hon. Liana Fiol Matta, Opinión disidente en Domínguez Castro et al. v. ELA I, 178 DPR 1, 157 (2010).
*253 Escribo estas líneas muy consciente del dolor, la angustia y la frustración que sienten miles de empleados públicos luego de que las disposiciones de la Ley Núm. 3-2013 entra-ran en vigor. No es una tarea sencilla aceptar que, en el estado de derecho que avala una mayoría de este Tribunal, el contrato que firmaron al momento de ofrecer su sudor y su energía al servicio de su país puede ser variado en cual-quier momento y sin importar sus repercusiones. Menos fá-cil debe ser explicarse por qué su Tribunal Supremo, último refugio para hacer valer sus derechos, claudicó a sus funcio-nes y optó por redefinir lo que significa la revisión judicial en controversias como la de estos casos. En un ordena-miento como el nuestro, la “autoridad” es el ejercicio del po-der de manera legítima. Hoy, al cerrarle las puertas de este Foro a miles de empleados públicos, una mayoría ha lace-rado su autoridad ante los ojos del Pueblo. Tardará mucho tiempo recobrarla.
Lamentablemente, una mayoría de este Tribunal se niega hoy a reconsiderar la errada decisión que emitió en Trinidad Hernández et al. v. ELA et al., 188 DPR 828 (2013). Ante este proceder, y debido a la muy persuasiva moción de reconsideración presentada por la representación legal de los sesenta y ocho (68) empleados de la Oficina del Contra-lor, me siento obligada a emitir estas breves expresiones.
Como adelanté en mi opinión disidente de Trinidad Hernández et al. v. ELA et al., supra, el razonamiento defec-tuoso de la mayoría se debe a dos (2) factores principales. Por un lado, en un afán desmedido y apasionado de resolver de una manera los casos de autos, la Mayoría procedió a consolidar casos disímiles y a analizarlos como si el único argumento presentado por los peticionarios fuera que la Ley Núm. 3, supra, era inconstitucional en su totalidad. Por otro, procedió a desvirtuar los principios de Domínguez Castro v. ELA L, supra, cert. denegado, Dominguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010), y terminó convirtiendo el rol de los tribunales en casos como los de autos en meros *254 actores autómatas que deben mostrar sumisión total a los otros poderes constitucionales.
Después de estos casos, cabe preguntarse qué valor le queda a la cláusula constitucional contra el menoscabo de obligaciones contractuales. Con su proceder, la Mayoría ha dejado listas las bases para el nacimiento del estado de ex-cepción que presagió Giorgio Agamben(1) y ha convertido nuestra Constitución en un “mero depósito de palabras”. El Contrato Social se ha quebrado; lamento que este Tribunal haya dado su anuencia para ello. Nuevamente, debo disentir.
I
Una Mayoría de este Tribunal yerra al dar un análisis somero y pasajero a la Ley Núm. 3, supra, a pesar de que en los casos de autos existían diferentes grupos de empleados que cuestionaron la inconstitucionalidad de su aplicación y de algunas de sus secciones. Para no tener que pasar el tra-bajo de diferenciar, analizar y verificar si la Ley Núm. 3, supra, era razonable para con este universo diverso de ser-vidores públicos, la Mayoría del Tribunal decidió obviar que en Puerto Rico existen tres (3) estructuras de Retiro, que contienen empleados con características distintas entre sí y cuya aplicación los afecta de manera variada. Claro, era mu-cho más fácil para la mayoría del Tribunal declarar consti-tucional de un plumazo la totalidad de un estatuto tan abar-cador y con repercusiones increíblemente diversas. Como adelanté en ese momento, con doce (12) páginas de análisis judicial, algo muy distinto a lo que ocurrió en Domínguez Castro es al. v. ELA I, supra, se le dio “revisión judicial” a un estatuto de la magnitud de la Ley Núm. 3, supra.
Por su excelente rigor analítico en cuanto a este aspecto, paso a citar in extenso de la Moción de Reconsideración presentada por algunos de los peticionarios de autos:
*255 Este Tribunal se equivocó al tratar el caso [de autos] como un monolito. Agrupó a todos los peticionarios sin considerar las diferencias sustanciales en relación con el impacto de la Ley 3 aplicables a los diferentes pleitos. Tan es así que en su resumen de los planteamientos de los peticionarios este Tribunal expresó que “las partes demandantes solicitaron ... que declarara in-constitucional la Reforma de Retiro.” Decisión Per Curiana, pág. 3.
No se trataba de “todo o nada”. Los 68 empleados de la Oficina del Contralor solicitaron que el TPI dictara “una Sentencia Declaratoria decretando que la Ley 3 es inconstitucional [únicamente] en la medida en que cambia el sistema de retiro en relación con las personas ... de la primera estructura del Sistema de Retiro con la expectativa de que iban a poderse ju-bilar con los beneficios otorgados por la Ley 447.” Petición del 8 de mayo, a la pág. 46, Ap. 46. Nada impedía que este Tribunal declarara inconstitucional la aplicación [de] la Ley 3 a los peti-cionarios, mientras decidiera que otras secciones de la Ley 3 eran medidas razonables y necesarias. Este Tribunal, al conso-lidar los casos, abdicó su responsabilidad de sopesar los intere-ses en conflicto y determinar si la totalidad o en su lugar algu-nas partes de la Ley 3 lesiona [b] a [n] injustificadamente los derechos adquiridos de ciertos empleados.
Est[e] fue el resultado en Strunk v. Public Employees Ret. Bd, 108 P.3d 1058, 1112 (Oregon, 2005), en [el] cual el Tribunal Supremo de Oregon consideró la constitucionalidad de una Reforma integrada y abarcadora llamada “PERS Reform and Stabilization Act of 2003”. El Tribunal [Supremo] de Oregon hizo un análisis concienzudo de las particularidades del Sistema de Retiro y diferenció entre los derechos que cobijaban distintas clases de participantes. El Tribunal [Supremo] de Oregon ex-plicó la diferencia entre los participantes del “Tier One”, quie-nes entraron en el empleo público antes de 1996 y empleados del “Her Two”. Después de una discusión profunda de las dis-tintas fórmulas para calcular las anualidades de los jubilados, además de cada disposición de la referida Reforma y a la luz de la evidencia extensa que fue presentada en un juicio en los mé-ritos sobre el estatus fiscal del fondo, el Tribunal determinó que ciertas disposiciones violaron la protección en cuanto al menos-cabo de las relaciones contractuales y avaló la constitucionali-dad de otras disposiciones de la Reforma.
El análisis hecho por el tribunal de Strunk dista mucho de la discusión somera que hizo este Honorable Tribunal en el caso de epígrafe. La mayoría de este Honorable Tribunal no consi-deró en lo absoluto las diferencias entre las distintas disposicio-nes de la Ley 3. Consolidó los casos y los trató por igual. Res- *256 petuosamente se somete que la consolidación, en combinación con la preocupación legítima sobre la precariedad del Sistema, cegó al Tribunal en relación con su deber de sopesar los intere-ses en conflicto en este caso, a la luz de las particularidades de cada caso. (Énfasis en el original suprimido y énfasis supli-do).(2)
Si se contrasta la decisión del Tribunal Supremo de Oregon en Strunk v. Public Employees Ret. Bd., 108 P.3d 1058 (Ore. 2005), con la que emitió este Foro podemos ver paten-temente la diferencia entre un Tribunal que ejerció efectivamente su poder de revisión judicial y otro que claudicó ante el momento histórico. Desde hace tiempo se viene advirtiendo que la litigación en cuanto a los sistemas de retiro culminaría indudablemente ante la consideración de los tribunales de las diferentes jurisdicciones. K.T. Cuccinelli et al., Judicial Compulsion and the Public Fisc—An Historical Overview, 35 Harv. J.L. & Pub. Pol’y 525 (2012). Ciertamente, ante los problemas económicos que enfrenta el mundo en estos tiempos los tribunales deben ser cuidadosos en el ejercicio de sus funciones. Pero para ser cuidadosos no hay que entregarse a las otras Ramas constitucionales. El Tribunal Supremo de Oregon supo cómo enfrentarse a esa delicada situación y analizó una reforma de retiro de ma-nera concienzuda. Entre otras cosas, se nombró un Comisio-nado Especial que recibió la abundante prueba y se analizó la aplicación de la reforma a los diferentes grupos de empleados que forman parte del Sistema. Y es que ese Tribunal comprendió que no es lo mismo un empleado joven que tiene el tiempo necesario para repensar su situación económica cuando se jubile y otro que está a las puertas del retiro y que sencillamente de hoy en adelante ve todo su futuro económico destruido. Sin embargo, este Tribunal se perdió en el bosque en vez de detenerse a ver los árboles, y en el afán de resolver atropelladamente los casos, decidió agrupar a los *257 empleados como si los efectos de la Ley Núm. 3, supra, fueran igual para todos.
Como coherentemente han alegado los peticionarios en su moción de reconsideración, este Tribunal tuvo alterna-tivas para analizar correctamente los casos de autos. No tenía por qué analizar a la ligera los mismos, cuando pudo muy bien realizar un estudio minucioso de la Ley Núm. 3, supra, y determinar que algunas de sus disposiciones es-pecíficas resultaban inconstitucionales por ser irrazona-bles en su aplicación. Con el rumbo contrario que decidió tomar una Mayoría de este Tribunal, se obviaron los efec-tos devastadores que tiene el estatuto y que inciden en el estándar de racionalidad que debió aplicar este Foro. Como muy bien discuten los peticionarios,
[e]n el caso de los 68 [empleados] de la Oficina del Contralor, el impacto de la Ley 3 es devastador. Lo crucial aquí no es que los 68 van a tener que trabajar unos años adicionales, ni es el aumento en sus aportaciones al plan de retiro. Lo que real-mente impacta a los peticionarios es que su anualidad antici-pada será drásticamente reducida. Es esta reducción drástica [la que estaba en controversia].
Amanera de ejemplo, veamos el caso de la peticionaria Ma-ría del Carmen Estarellas Sabater, quien ha sido participante del Sistema por 26 años y cuenta con 54 años de edad. Peti-ción, Apéndice a la página 4 párrafo 3.3(20). Éste sería el es-cenario de la señora Estarellas al momento del retiro antes y después de la vigencia de la Ley 3 asumiendo que devengara un salario promedio de $3,000 mensuales:(3)
[[Image here]]
*258 No comprendo como una mayoría de este Tribunal se negó a ponderar detenidamente este impacto tan severo. No hay manera de concluir que un daño tan sustancial a algunos empleados públicos específicos pueda sobrevivir un estándar de razonabilidad. A menos que, de facto, ese no sea el estándar que deben aplicar los tribunales en Puerto Rico.
II
Y he ahí el problema principal del razonamiento de una mayoría de miembros de este Foro. Con sus meras doce (12) páginas y su análisis judicial elemental, la Mayoría ha llevado el ratio decidendi de Domínguez Castro et al. v. ELA I, supra, a fronteras inimaginables. Más allá de la controversia en cuanto al peso de la prueba en los casos de autos, o si existían otras medidas menos onerosas, el pro-blema del manejo de estos casos fue que este Tribunal pro-movió una imagen de que los trató como si no hubiera otra alternativa: tenía que declarar la Ley Núm. 3, supra, constitucional. En el camino, el estándar jurídico para analizar estas controversias se convirtió en una mera fórmula matemática:
Obligaciones contractuales + Alegada crisis económica + expo-sición de motivos que lo diga x deferencia judicial absoluta = constitucionálidad del estatuto
De ahora en adelante, ¿de qué sirve reconocer un con-trato en el cual el Estado puede alterar sus términos, in-dependientemente del número de empleados que afecte? ¿De qué sirve tener disponible la revisión judicial si el Tribunal Supremo ni siquiera analizará el impacto específico de las medidas debido a una deferencia absoluta que hay que brindarles a las otras ramas? Reitero, esa no es la base de Domínguez Castro et al. v. ELA I, supra. En controver-sias como las de autos, se le cerró la puerta a la revisión *259 judicial efectiva en nuestro ordenamiento y se le dejó claro a las otras ramas que, a expensas de nuestros servidores públicos, tendrán nuestra deferencia total y sumisa. Lamento que cinco (5) de mis compañeros le hayan otorgado ese cheque en blanco a las otras ramas. No tengo otra alternativa que disentir de ese proceder.

 G. Agamben, Estado de excepción, Buenos Aires, Ed. Adriana Hidalgo, 2004.

 Moción de Reconsideración, Caso Núm. CT-2013-8, Pieza 2, págs. 5-6.

 Íd., pág. 4.